IN RE: SILVA DAIRY, LLC, Debtor.

**Bankruptcy Case No. 10–41484–JDP**

United States Bankruptcy Court, D. Idaho.

Signed June 21, 2016

Entered June 22, 2016

Steven L. Taggart, MAYNES TAG-GART, PLLC, Idaho Falls, Idaho, Attorney for Debtor.

Jennifer DeHaan Cummins, Boise, Idaho, Attorney for Harry DeHaan.

## MEMORANDUM OF DECISION

Honorable Jim D. Pappas, United States Bankruptcy Judge

### Introduction

In the motion before the Court, chapter 12[1] debtor Silva Dairy, LLC ("Debtor") asks the Court to revoke its prior approval of the fee application of Debtor's former counsel, Harry C. DeHaan ("DeHaan") and to require that he disgorge all amounts paid to him for those fees. Motion to Revoke Approval of Application for Attorney Fees and for Disgorgement of Fees Paid to Harry C. DeHaan, Dkt. No. 229 ("the Motion"). Debtor bases this request on its assertion that DeHaan failed to make adequate disclosures of the source of funds paid to him for a retainer, as well as allegations that he forged the signatures of Debtor's principal on certain documents filed with the Court. Id. DeHaan strenuously opposes the Motion, denying all its material allegations. Opposition to Motion, Dkt. No. 232.

---

**1.** Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

Following an evidentiary hearing held on May 11, 2016, the Court took the issues under advisement. After due consideration of the evidence, testimony, and arguments presented, as well as the parties' briefs, and the applicable rules and law, this Memorandum sets forth the Court's findings of fact and conclusions of law, and resolves the Motion. Fed. R. Bankr.P. 7052; 9014.

### Findings of Fact

Debtor operates a dairy in Buhl, Idaho. Its principal owners are brothers Maximaino ("Max"), Anthony ("Tony"), Alberto ("John"), and Heilo ("Eilo") Silva (collectively, "the Silvas"). Ex. 106. The dairy has been operated in Buhl by members of the Silva family for more than twenty-five years. Second Am. Ch. 12 Plan, Ex. 108. At all times relevant herein, Debtor's dairy herd was housed and milked at a leased facility. See First Am. Ch. 12 Plan, Dkt. No. 70, at p. 23.

The Silvas own land through another entity called Silva Land, LLC ("Silva Land"), in which they are the principals. On this approximately 440 acres, Silva Land raises corn, triticale, grain and hay. Id. Silva Land's finances have been collectively managed via Silva Dairy.

Debtor milks approximately 700 cows. Id. As of April 1, 2011, when its second amended chapter 12 plan was filed, approximately 250 of those cows belonged to JT Livestock, an entity owned, at least in part, by Jack McCall. Id. Beginning in May 2010, JT Livestock agreed to pay rent to Silva Land for use of its dairy facility[2],

---

**2.** There is some confusion about which entity JT Livestock contracted with to provide dairy space. The lease agreement memorializing the arrangement, discussed below, is between JT Livestock and Silva Land. Ex. 109. However, the confirmed plan provides that "J & T Livestock" pays rent to Debtor, rather than Silva Land. Third Am. Ch. 12 Plan, Dkt. No.

as well as a separate management fee to feed, care for, and milk the cows.[3] Lease Agreement, Ex. 109.

Over the years, the Silvas, Silva Land and the Debtor have all needed to borrow money to fund operations. For example, in October 2006, they, along with several other Silva-owned entities, executed a promissory note for $550,000 in favor of AgStar Financial Services, FLCA, acting as the agent for lender McFinney Agri–Finance, LLC ("McFinney"). Ex. 106. As the Court understands it, Jack McCall owned an interest in McFinney, although the nature and extent of that interest is unclear. In March 2009, the Silva borrowers again experienced cash flow issues and they executed another promissory note in favor of McFinney in the amount of $1,060,000. *Id.* As of the date of the bankruptcy filing in August 2010, the Silva borrowers, including Debtor, still owed substantial sums on these notes.

When it became apparent that borrowing more and more money was not the solution to the Silvas' collective financial problems, they discussed the possibility of filing for bankruptcy. Because they were housing and managing his herd, near the end of July 2010, Max talked to Jack McCall about the prospect of a bankruptcy filing. McCall inquired about who the Silvas were planning to use as their attorney, and when Max indicated he did not know any bankruptcy attorneys, McCall told him

about DeHaan. McCall then placed an introductory call to DeHaan, and Max made an appointment to meet with him.

During their initial meeting, DeHaan discussed Debtor's options under chapter 12 with Max. He informed Max that, to pursue such a case, DeHaan would need a retainer of $10,000 to begin work. Not surprisingly, the Silvas were cash-strapped, behind on loan payments, and could not come up with such a retainer. Max testified that he and DeHaan discussed the possibility of asking McCall for the money, which is exactly what Max did. At a later meeting, McCall agreed to give Max the money for the retainer, and McCall's wife wrote Max a check payable to "Max Silva" for $10,000 on a JT Livestock bank account; she noted in the memo line of the check that the money was for "facility rent". Ex. 100. In his mind, though, Max considered the transaction to be more in the nature of a personal loan which the Silvas could "work off" through managing JT Livestock's dairy herd. In contrast, DeHaan testified that he understood that the $10,000 given to Max by Mrs. McCall was for rent owed for housing the JT Livestock herd. Indeed, it is undisputed that JT Livestock had not paid any facility rent to Debtor or Silva Land prior to this time, although the parties' arrangement had only been in place for one month. Thus, conceivably, as a rent payment, the $10,000 could have reflected some rent already owed, as well as

100, at p. 6. While it is not necessarily critical to its decision, the Court presumes the lease of the dairy space was between JT Livestock and Silva Land, which entity actually owned the property upon which the dairy was located.

3. The evidence is likewise unclear about which entity agreed to manage the JT Livestock herd. While the management portion of the Lease Agreement suggests the Silvas would accomplish the task of managing JT Livestock's herd, the state court found that it

was Debtor who agreed to manage McCall's herd, and in fact, did so. Memorandum Opinion, Ex. 200, at pp. 3, 11, 16. Moreover, the state court found there was no meeting of the minds concerning who was responsible to provide the management services, leaving Debtor with an unjust enrichment claim against JT Livestock and McCall. Ex. 200 at p. 16 & n.7. Again, as with the dairy lease, this Court need not resolve this disputed fact at this juncture.

an advance on rent to be incurred by JT Livestock in the future.

Max immediately delivered the check to DeHaan. While DeHaan testified it was his practice to accept payment for fees solely from the client, and never from a third party, Max testified that DeHaan advised him he should not deposit the funds in Debtor's bank because DeHaan was concerned that the bank, one of Debtors' creditors, might seize the funds to apply to its debts. DeHaan disputes he gave such advice to Max. Regardless, Max endorsed the check directly over to De-Haan, who took it for the retainer. De-Haan testified that he was comfortable accepting this money because he believed the $10,000 was owed to one of the Silva entities by JT Livestock, and that as their manager, Max was at liberty to use the funds however he wished.

Apparently, DeHaan was not at all concerned that the retainer funds originated with an entity owned at least in part by McCall, a potential creditor in Debtor's impending bankruptcy case. Though he was less than clear on the point, DeHaan testified that he understood that an entity called "Agri Access" had purchased McFinney's rights in the promissory notes executed by Debtor, Silva Land, and the Silvas, and therefore, Agri Access, not McCall, was the creditor. DeHaan also testified that he was unaware that Debtor was indebted to McCall at the time of the bankruptcy filing, and that if he had known, he would not have accepted the retainer check that he did, as it posed a possible conflict of interest. The record contains no information to support De-Haan's understanding on this point.

Debtor filed a chapter 12 petition on August 18, 2010. Dkt. No. 1. Along with other same-day filings, DeHaan filed an Application to Employ Attorney, in which he represented that "[t]he debtor has paid the DeHaan Law Office a retainer fee of $10.000,00 [sic] for services rendered or to be rendered in this case." Ex. 101. His supporting declaration provided that he had billed Debtor $3,944 for pre-petition services. *Id.* That same day, DeHaan filed a Rule 2016(b) disclosure stating that Debtor had paid him a $10,000 retainer. Ex. 102.

On November 28, 2011, DeHaan filed a second Application for Employment, Ex. 104, which the Court later approved, Dkt. No. 127. That application contained the same declaration found in the prior application regarding the source of DeHaan's retainer. Ex. 101.[4]

On October 11, 2011, DeHaan filed an application for approval of interim compensation requesting an award of fees totaling $35,150.01. Ex. 110. According to the application, of the $10,000 retainer, $6,000 remained, which DeHaan sought to use to pay the approved fees and costs, while the balance of the fees, $29,150.01, were to be paid through payments under Debtor's chapter 12 plan. *Id.* After notice, and without objection from Debtor, the application was granted and compensation and expenses approved in the amount sought on January 13, 2012. Dkt. No. 135.

During the case, chapter 12 trustee Forrest P. Hymas ("Trustee") advised De-Haan that the various agreements existing between Debtor, Silva Land, and others should be memorialized in writing so the respective interests of Debtor and the other parties, and the terms of those con-

---

4. Debtor perpetuated this statement of where the retainer funds originated in an amendment to the Statement of Financial Affairs DeHaan drafted and filed on behalf of the Debtor. Dkt. No. 108 ("Debtors made a deposit of $10,000 in Harry DeHaan's trust account....")

tracts, could be ascertained. As relevant here, to accomplish this, DeHaan drafted a number of contracts, including a Lease Agreement ("the Lease") in December 2010 (although its effective date was to be June 1, 2010) providing that JT Livestock would lease dairy facilities from Silva Land for $10.50 per cow per month. Ex. 109. It also provided in a hand-written space that JT Livestock would pay Max, Tony, and John Silva the total of $1,000 per month as a management fee for caring for the JT Livestock herd at the Silva Land facility. *Id.* Following its preparation, the Lease was purportedly signed by Max and McCall at DeHaan's office, however, a controversy exists concerning the terms and execution of the Lease on two fronts.

First, Max testified that he did not, nor would he ever, agree to a $1,000 per month fee for the Silvas' management of the JT Livestock animals, as that was a completely inadequate sum for the work involved in caring for a dairy herd. And second, though the Lease appears to have been signed by Max before a notary (DeHaan's paralegal) on December 2, 2010, Max provided convincing evidence to the Court showing that he departed for Mexico from the Boise airport at 7:00 a.m. on the morning of December 2, and thus, he did not sign the Lease as indicated. Exs. 111, 112. Instead, Max contends that the $1,000 figure for the management fee was inserted, and his signature on the Lease was forged, by DeHaan. Max testified that the first time he saw the Lease was in early 2013,

when Trustee forwarded a copy to him. Max further alleges that his signature was forged on Debtor's original chapter 12 plan, Ex. 107, but he acknowledges that he did, in fact, sign the second amended chapter 12 plan, Ex. 108.[5]

According to Max, and contrary to the Lease DeHaan drafted, no specific management fee was agreed to by the Silvas and McCall for JT Livestock. Instead, the Silvas intended to manage the JT Livestock herd, and that the value of their labor would be credited against the debt that Debtor owed to JT Livestock or Jack McCall. However, when that arrangement did not work out, in August 2012, McCall removed his herd from the Silva Land property, and state court litigation ensued. In 2013, Green River Ranches, LLC, another entity owned in part by Jack McCall, sued the Silvas and Silva Land for an unpaid promissory note executed in connection with the purchase of the Silva Land property.[6] Ex. 200. At least two other actions were filed by McCall and/or entities in which he had an ownership interest, against the Silvas and/or their entities.[7] McCall also prosecuted an action against Max Silva and Silva Dairy in state court in 2013, seeking repayment of the $10,000 retainer.[8] Ex. 201. When the state court rendered decisions unfavorable to the Silvas and Debtor concerning the disputed management fees, on March 1, 2016, through new counsel, Debtor filed the Motion. Dkt. No. 229.

---

5. Of course, the Lease as written is between JT Livestock and Silva Land, and therefore was not administered under any of the chapter 12 plans filed with the Court, although it was attached to the second amended plan, Dkt. No. 80, as well as the third amended plan, Dkt. No. 100. The third amended plan was ultimately confirmed by the Court. Dkt. No. 113.

6. Twin Falls Case No. CV-13-1263. Silva Dairy also signed the promissory note, but was not joined in the state court case on account of the bankruptcy filing. Ex. 200.

7. *McCall v. Max Silva, et al.,* Case No. CV-13-3154; *McCall v. Silva Land, et al.,* Case No. CV-13-4732. Ex. 200.

8. *McCall v. Max Silva, et al.,* Case No. CV-13-4728.

### Conclusions of Law and Disposition

The Motion alleges that the relief it seeks is authorized by § 105(a), § 329, § 330, Rules 2014(a), 2017, 9024[9], and Local Rule 2014.1(a)(2). Specifically, Debtor seeks a "revocation" of the order entered by the Court approving the payment of fees earned by DeHaan representing Debtor in the chapter 12 case, and disgorgement of all fees previously paid to him, either via the retainer or through the confirmed chapter 12 plan. As noted above, Debtor urges this relief is justified for two reasons: first, because DeHaan forged Max's signature on documents filed with the Court; and second, because DeHaan's disclosures surrounding the source of the $10,000 retainer he received were inadequate and inaccurate. DeHaan denies that he forged Max's signatures and contends his fee disclosures were sufficient.

The Court will examine each issue in turn.

### 1. The Alleged Forgery

Debtor contends that DeHaan forged Max's signature on at least two documents in connection with this case, and that his conduct constitutes grounds for revocation of the Court's order authorizing payment of his fees. Specifically, Debtor alleges that Max's signature on the original chapter 12 plan filed with the Court, Ex. 107, as well as his signature on the Lease, Ex. 109 (which was thereafter appended to versions of Debtor's plan), were forged.

The Court accepts Max's version of the facts on this issue, at least in part. Max credibly testified that the signatures on

the two documents (i.e. Debtor's original plan and the Lease) were not his.

A number of other signatures on documents filed with the Court that the parties seemingly agree contain Max's authentic signature were also admitted in evidence for comparison. Other circumstantial evidence supports Max as well. Though no handwriting expert was called to testify, the Court's admittedly untrained review of the undisputed documents strongly suggests that Max did not sign the original chapter 12 plan or the Lease.[10] Moreover, Max's signature on the original chapter 12 plan was dated December 1, 2010. But DeHaan's own billing records shows that he did not finish drafting that plan until December 2, 2010. Finally, while the Lease purports to have been signed by Max on December 2, 2010, Max proved to the Court he was in transit to Mexico on that day.

On the other hand, while the Court can comfortably conclude that Max's signatures on the original plan and the Lease were not his, the evidence is insufficient to determine that it was DeHaan who forged them. Though the plan and the Lease were in DeHaan's control prior to being signed and filed with the Court, it is possible someone other than DeHaan signed Max's name to them, possibly a member of DeHaan's staff. But absent better evidence implicating DeHaan, the Court declines Debtor's invitation to sanction DeHaan through the loss of fees for the irregularities in these documents.

### 2. Fee Disclosures

Attorneys who represent debtors in reorganization cases must be disinterested

---

**9.** As will be seen from the discussion below, reliance on Rule 9024, which governs relief from a judgment or order, is unnecessary.

**10.** The Court also believes Max when he testifies that he did not authorize anyone to fill in

the space of the Lease to include a $1,000 per month management fee. But the record does not establish who may have penned this provision.

and not hold interests that are adverse to those of their client, the bankruptcy estate. § 327(a). As such, payment of a debtor's attorney fees by a third party could give rise to a lack of disinterestedness, depending upon the connections of the third party to the debtor. To ensure compliance with this directive, the Code and Rules require affirmative disclosures concerning their fees, and the source of any payments for those fees, by attorneys seeking to represent debtors. For example, the Code provides:

> Any attorney representing a debtor in a case under this title ... shall file with the court a statement of the compensation paid or agreed to be paid ... for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, *and the source of such compensation.*

§ 329(a) (emphasis added). Rule 2016(b) implements this Code provision. It requires that:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief ... the statement required by § 329 of the Code....

Moreover, the Code provides that the Court shall only approve the employment of an attorney under § 327 upon submission of an application which includes, *inter alia,* "any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest...." Rule 2014(a).

Finally, the Rules require further disclosures when an attorney for a chapter 12 debtor applies for approval of his compensation:

> An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. *An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised* ....

Rule 2016(a) (emphasis added).

Under these rules, as Debtor's counsel, DeHaan was required to disclose, among other information, the source of his retainer. He failed to accurately and completely do so. In his employment applications he filed with the Court, as well as his Rule 2016(b) disclosure statement, DeHaan represented to the Court that he received a $10,000 retainer *from Debtor.* This statement was, at best, incorrect, and more likely a misrepresentation.

DeHaan knew the funds for his retainer originated with JT Livestock or McCall; indeed, the check endorsed and given to him by Max was written on a JT Livestock bank account. DeHaan testified that he believed that the money was for rent owed to Debtor by McCall, and that he believed the retainer funds were being given to him by Max Silva as an agent (*i.e.,* the manager) for Debtor. However, this assertion stands in contrast to DeHaan's repeated testimony that he concluded, after doing his due diligence, that his client, Silva Dairy, was neither a creditor nor debtor to Jack McCall or his entities. As such, he could not have assumed the $10,000 was in any way Debtor's money.[11] Because Silva

---

11. The state court found the $10,000 check to Max Silva was a rent payment owed to Max

Land is the entity which owns the land where the JT Livestock herd was to be housed and cared for, the $10,000 either belonged to Silva Land, or at best, to the Silvas as the herd managers for Silva Land. In no way can the evidence be construed to show that the $10,000 belonged to the Debtor. As such, DeHaan's statements on documents he filed with the Court representing he received the retainer from Debtor are false.

The Ninth Circuit's decision in *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.)*, 63 F.3d 877, 880 (9th Cir.1995) was factually similar to this one. There, the debtor's counsel disclosed to the bankruptcy court that a retainer had been paid to him by the debtor, when in fact, it came via a check from debtor's president drawn on his personal checking account. In highlighting the deficiencies in counsel's disclosures in the bankruptcy case, the Ninth Circuit explained that, because the Code and Rules impose an independent disclosure responsibility upon attorneys, "failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule" and that "[e]ven a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees." *Id.* at 880, 882. As such, "[a lawyer] must at least disclose the facts of the transaction, as those facts were known to the firm." *Id.* at 882. When false, incorrect or incomplete disclosures are made in the bankruptcy case by counsel, the Ninth Circuit has held that the "attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and

Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees." *Franke v. J.K. Tiffany, U.S. (In re Lewis)*, 113 F.3d 1040, 1045 (9th Cir.1997); *In re Park—Helena Corp.*, 63 F.3d at 880 ("failure to comply with the disclosure rules is a sanctionable violation").

In this case, based upon the circumstances, the Court concludes that DeHaan's defective disclosures about the source of his retainer were at least inaccurate, and possibly just plain untrue, and that he clearly failed to comply with the disclosure requirements of the Code and Rules. To be true to the purpose and spirit of the disclosure rules, DeHaan's conduct is sanctionable. While under the case law, the Court could require DeHaan to disgorge all of the fees paid to him as Debtor's counsel in the bankruptcy case, because only DeHaan's disclosures about the source of the initial retainer were tainted, the Court concludes it should not disturb post-confirmation payments made to DeHaan through the plan. As such, the Court denies Debtor's motion to revoke prior approval of DeHaan's fee application and thereby to, effectively, deny DeHaan any payment for his services. However, in the exercise of its discretion, because he has violated the disclosure rules, the Court concludes DeHaan should disgorge the $10,000 paid to DeHaan as a retainer, as to which proper disclosure was not made.

### Conclusion

There was inadequate evidence offered to show that DeHaan committed a forgery. While Max's signatures on the original plan and the Lease were not his, the record does not show who signed his name to those documents. However, the Court

---

Silva, Silva Land or Debtor. It was unnecessary for the state court to resolve that fact.

Ex. 201, p. 10.

concludes the disclosures DeHaan made to the Court concerning the source of the $10,000 retainer he received in this case were false. Those funds came from JT Livestock, one of Debtor's creditors, not from Debtor, as DeHaan represented in the employment applications and Rule 2016(b) disclosure statement. Accordingly, disgorgement of that retainer is warranted.

A separate order will be entered.